Now we're going to hear United States v. McFadden-Brown in Germany. Good morning, Your Honors. My name is Leonard Leto, attorney for Amai, Germany. I'm named last on the calendar, but consensus is that I should go first, so I'm going first, Your Honor, and I would like one minute of rebuttal time. Fine. Your Honors. Do you know, Mr. Leto, who's going to follow you, just so that we're— Donna Newman is going to follow me. Great. And then Ms. Wolf? Yes, Your Honor. All right. Perfect. Thank you. This trial involved either one of two potential conspiracy scenarios. Either it's a hub-and-spoke conspiracy or it's a rimless wheel of several conspiracies. I think, based upon what's in my brief, there's no question that in this case—well, I shouldn't say that. Of course, there is a question. That's why we're here. There's a question whether it's a rimless wheel or whether it's a hub-and-spoke. But here's the thing. Under one case from the Ninth Circuit, Barnard v. United States, this appears to be a rimless wheel of several conspiracies. And both the government and the district court in the court below ignored Barnard, even though I cited it. Maybe that was an oversight. Now, they've ignored it again. Now, here is the thing. If it's a rimless wheel, and I'm suggesting that it is, Mr. German is entitled to a new trial, and here's why. This was a staged car accident case. So was Barnard. In this case, there were six independent conspiracies, no interdependence amongst the spokes. If that's the case, what we have is a rimless wheel. And Mr. Germany was prejudiced by the fact of the other five conspiracies and the 27 additional co-conspirators. The only evidence at all— Were McFadden and Cook, though, central to all of the different counts of the indictment? Yes, they were. Common to all of them, including your clients, right? Yes, they were the hub. And Germany and the other conspirators formed the spokes. But you needed a rim connecting the spokes, and that's exactly what happened in Barnard, is that there was a staged car accident case just like this one. And in Barnard, you had the main defendant, who was common to all five staged accidents on the Plan VI. But there was no interdependence amongst the spokes. Without that interdependence, all you really have is a rimless wheel. Where is the rim? The fact that one core or two core co-conspirators is moving from spoke to spoke is not enough. The conspirators must know or have reason to know there's some type of interdependence or they're part of a larger operation. And that's not what we have here. In fact, the only evidence that the district court cites to, and the government parrots in its brief, is one single conversation in which one of the co-conspirators who formed the hub, Roshan Cook, actually says to Amai Germany, if believe, and for these purposes we must believe it, he's coaching him how to do the accident. But that's it. So to Judge Hurley in district court, that should have let Mr. Germany know that he was part of a larger operation. But that's not true. All right? The fact that he was coaching him, well, so what? It's coaching him how to do this accident. There was no talk of other accidents, no talk of doing an additional accident with this person. And in fact, Mr. Germany did not even go to the same medical providers or the same lawyers that any of the other conspirators went to. And this is really what it comes down to. Even this court in United States v. Bertolotti said, four conspiracies is too many. Well, six is more than four, and we don't have to get into a precise number here. The point is this. Could the jury reasonably have been influenced by the transfers of guilt? Mr. McFadden was the main defendant on trial. He was involved in all six conspiracies and with all of the other 27 co-conspirators. If we take by way of example that, say, there were ten conspiracies and a hundred co-conspirators, I think even at that point the government would agree you have some transference here. Ten conspiracies, a hundred conspiracies is too many. But the government points out that no multiple conspiracies charge was asked for. Yes. Is that true, and how does that affect your argument? Yes, it hurts me, and that was my fault at the trial. I should have thought of it, and I did not. So I have to eat that. I understand that's the case. I should have requested a multiple conspiracy charge. But at the end of the day, if that's what I did, it's done. This is a sufficiency argument. It's not sufficiency because one of the things that litigants have tried in the past, look at each conspiracy on its own. If the evidence would have been sufficient to convict, if that were the only case, should we let the conviction stand? The Supreme Court said no, and I believe it was in Katiekos. But the point is — It's a plain error, failure to give a multiple conspiracies charge? Is that the argument? I don't know if I can pinpoint it as failure to give the charge. It's just that is there a danger of transference of this guilt to this defendant? I'm trying to identify what the error is. If it's not a sufficiency claim, then it's either a claim that there's an error in the instructions, which would have to be on the plain error standard, or it's a failure to give a severance or something like that. It would probably be both. It was one mistake, a multiple conspiracy charge, but even that wouldn't have helped because of the transference of guilt. You really needed a severance here. And was a severance requested? No. So it's a plain error severance argument. That's probably what it was because a multiple conspiracy charge would not have solved the problem here. Thank you. You've reserved a minute for rebuttal. Thank you. Mr. Leto. Ms. Newman. Thank you. My name is Donna Newman, and together with Clara Powell, who's at the table, we represent Alla Brown. Your Honor, we join in Mr. Germany's argument with respect to count two. However, we would indicate that it really is a sufficiency argument. However, I would like to address my statements here to count ‑‑ I'm sorry. We join in count one in Mr. Leto's argument. But I'd like to address my arguments here, my four minutes, to count two. And likewise, we say that that argument with respect to count two is insufficient, that it was ‑‑ that no rational trier of fact could have found the essential elements of the crime with respect to count two, the substantive, beyond a reasonable doubt. And we say that with relooking at the totality of the circumstances here. And when we do, we realize that as to the evidence presented with respect to Mr. Brown's participation in the January 22nd accident of 2010, that there was insufficient evidence to demonstrate that, in fact, that there was the second collision, which is really the subject of the conviction since the first collision that happened, there was nothing mailed. So it's only the second collision that has to be directed to the evidence. You're saying that a reasonable juror would need to have had a reasonable doubt about whether somebody who was specifically told that there was going to be a fake accident after that fake accident happened would assume that or could reasonably have believed that a second strike by the same driver driving the same U-Haul slightly later was a legitimate accident. That is correct. And I will explain the facts of how we get there. The evidence is presented. And it's because after the first collision, Mr. Cook, Russian Cook, who was the main witness, because there were only two with respect to that accident, despite the plethora of evidence with respect to all other unrelated accidents to Mr. Brown, said that after the first accident there was much confusion. He speaks about not himself but Mr. McFadden talking on the phone, but never does he say, in fact, he specifically says he doesn't know who he was talking to. The other witness, Ms. Tang, who was driving the U-Haul, states that she spoke to Mr. McFadden, but not that she ever spoke to anybody in the red Chrysler Pacifica in which Mr. Brown was a passenger, not the driver. So there is no evidence as to any communication between. How long is it between the two strikes by the U-Haul truck? According to Mr. Brown, excuse me, according to Mr. Cook, approximately 20 to 25 minutes. But during that time, according to Ms. Tang, she had turned around and gone back to Brooklyn where they had come from. So we don't know exactly. There wasn't much communication. And the important point here with respect to Mr. Brown, he's a passenger. So we have no statement as to what he was thinking. We do know, in fact, from Mr. Cook's testimony, that he was a reluctant participant to begin with. But he did agree that he was going to be in something that was a staged fake accident. Yes, that's it. According to Mr. Cook, if you believe him, yes. However, we also know that he took much persuasion and that there was a lot of confusion. And while the first stage accident was planned, they had a spot, there was going to be a signal. In fact, the second stage accident was unplanned. That is, Mr. Cook did not indicate where it would be, how it would be. And, in fact, he didn't see it. So we don't get from him what exactly happened. We only get that from Ms. Tang or the police report. And the police report has a notation that Mr. Brown was injured. So we have that from the most objective observer. We don't have any pictures of the vehicle. We don't have any statement from even Ms. Tang as to the conditions of the red Chrysler Pacifica. All we know is that she said that she was going down a one-way street. This other car was trying to make a right hand, I believe, and she was making a left. And there was this collision. But there is no statement as planned as opposed to the first stage accident. So we have, there is not beyond a reasonable evidence that was submitted at trial to support a beyond a reasonable doubt that Mr. Brown knew or agreed to participate in a second stage accident, which he could have believed. Is there any evidence that he withdrew from it and said, look, I don't want to do this anymore? After the first one was ineffective, I'm done here. Was there any evidence presented that he withdrew from the stage accident? We have no evidence of what he said. We only have that he was in the car. And it's that circumstantial evidence that the government has relied in their brief. And I submit in that he was a passenger in January away from where he lived that it's unreasonable to say that that fact alone is the basis for his continued participation in an accident which he was not controlled. What we're missing is what they tried to supply through the evidence of all the unrelated accidents here. Were there any other unrelated accidents that had two stages? To my recollection, I'm not sure that there were. I submit I'm not clear. I'm not sure what the other accidents could add to this. It's basically the same story, which is he agreed to participate in a staged accident. They staged the accident. Apparently there was some screw-up. They decided to do it again. I take your point that there's no affirmative evidence that somebody told Mr. Brown we're going to do it again. But the question is could a reasonable jury draw an inference that if he agreed to be in this, he knew that this was still the fake accident? Well, I would submit they get to that by all the other evidence. I don't understand why you say they get to it by things that don't involve two-stage accidents. If there were ten other accidents where each time they did explain to the other people that, sorry, the first one didn't work, we're going to do another fender-bender, that might be a point. But I don't see how that applies here. The fact that there were other staged accidents doesn't add to what Brown knew about the second hit. It's what is sort of concededly sufficient evidence that he knew that there was going to be a staged accident that day and he was in it. Well, I would submit I believe that there was one other, but since my recollection on that is hazy, I don't want to. It would be in the record. And I believe it's part of our brief where we describe all the other evidence that we agree with the court is not relevant, what we do believe prejudiced the jury into thinking what Mr. Brown knew. And I submit based on the record as we have it, it's speculation, particularly that Mr. Cook indicated he had to persuade Mr. Brown to begin with. There is nothing that he submitted. There's no evidence what he said to the attorney. There's no evidence of any medical treatment, that he went to the medical clinics of the others. There's none of that evidence. So I submit that it was speculation upon which the jury based it and the circumstances of him being in the car alone was not sufficient for to get to the other, which is the mailing. But I see my time is up and I'm sorry. Thank you. Two minutes. Thank you, Ms. Newman. Ms. Wolfe. Good morning, your honors. I will be addressing on behalf of Mr. McFadden two issues which are independent to him. He was the only defendant who, excuse me, the only defendant who asserted his right to a speedy trial. He was the only defendant who was ultimately sentenced to serve jail time. Under the Speedy Trial Act, time cannot be excluded unless there is a record of the reasons why the ends of justice will be served by the exclusion. The exclusions which we've addressed, which I've addressed in Mr. McFadden's brief, were for ongoing plea negotiations. There were never, there was other than saying, the prosecutor saying that we're talking to, we think we're close with three people and maybe not so with two people. There's never any elaboration of why the process should take any more time. And that, it was consistent throughout the continuances, that they were granted for ongoing plea negotiations. Is this at a time when Mr. McFadden is representing himself? No. This, all of the time that I am arguing should not have been excluded and result in a violation of the Speedy Trial Act occurred before he made a motion to proceed pro se. Did his counsel ever say to the judge, judge, that's not enough, I want more detail about these plea negotiations? No, the opposite. His lawyer said, I've told my client that there's no basis to make a speedy trial motion. I don't know what a reasonable amount of time is, but I don't think this is it. And when- That's at the stage when we're talking about should he make a speedy trial denial motion, but as these exclusions are made, it seems to me the prosecutor gets, tell me if I'm missing something, prosecutor gets up and says, we're in plea negotiations with some of these people, and therefore we need more time. And the judge says, well, I think it would actually be, he uses the term miscarriage of justice if we didn't give these people time. And in fact, under the rules, if you give them time, McFadden trails along, right? So I'm not sure what's missing there from the judge's finding. And what you're telling me is what's missing is the prosecutor should have elaborated more on what the state of negotiations was and why it's taking so long. I guess I have two questions. One is, is there any case where we've said that that much needs to be said? And number two, isn't that argument waived if the lawyer doesn't ask for more elaboration? No, because in Zegner, the Supreme Court said the consent of the parties, an agreement of the parties. The consent of the parties. The prosecutor makes a statement. We've got these plea negotiations going on, and we need more time. The judge says, that's good enough for me. Now, at that point, I'm wondering what it is that, what more, is there any authority that more than that is required? And point two, even if there is, isn't it incumbent on somebody to say to the judge, judge, that's not enough. I want to know more about the state of these negotiations. I would argue that under Zegner, there is no obligation for someone to a party to object, because it either is an adequate basis, there either is an adequate basis for an exclusion, and there's not. So in Zegner, the issue was where. The judge was clearly erroneous in finding that the ends of justice required an additional time for plea negotiations. And that the record is devoid of the reasons that the Speedy Trial Act requires in order for there to be an exclusion. So what should be there? There should have been, let me say this. There's always going to be a tension when you have one defendant in a multi-defendant case who wants to go to trial today or sooner, and you have other defendants who want as much time as they can to prepare the case or to negotiate with the government. So the defendant who wants to go to trial should at least move to sever, right? He should at least move to sever. The court here, that didn't happen because his, Mr. McFadden's- Back to my question. What should have been in the record that Judge Hurley should have referred to saying these are the reasons? Other than, and I suspect everybody in this room has been in these cases with multi-defendants, and some person wants more time to see if she can negotiate a plea agreement. I think it's this. It is at a minimum with two different positions being taken amongst co-defendants. The judge can say to the defendant who wants to go to trial ASAP, you have to cool your jets a little and say to the other defendants who don't feel any pressure to move the case forward swiftly, that they better speed it up, that they better conclude their negotiations by a certain time, or give him good reasons why it can't be done. That was never done here. All the judge said was that Mr. McFadden wasn't going to be allowed to take over the speedy trial clock, and that he couldn't upset the way this case was going. Can I just ask one record question? Sure. My reading of the record indicates that there were actually waivers obtained too, right, from the other co-defendants? Yes. In addition to the findings by the district court, there were waivers obtained of the speedy trial rights during these continuances, right? Yes. Does that make any difference? In other words, under H-6 where the co-defendant provision, if you've got four defendants who all waive speedy trial because there's police, whatever reason, one is not waiving, doesn't that provision in speedy trial act say then because we go on the slowest clock, then unless you make a motion to sever or dismiss, you're stuck with the defendant who waived the speedy trial rights under the act? Well, it's true that you go on the slowest clock, but there have to be articulable reasons why the interests of justice support an exclusion of time because it's not just the defendant's interest. It's the public's interest and a judge. In fact, in Parisi, this court said that adopting the party's reasons for an exclusion of time is not a judge exercising its independent judgment. May I move on, Your Honor, to the sentencing point, Your Honors, because I do think it's important. I'm sort of out of time, so. Okay. I will, whatever. At the end of 2015, before the sentencing in this case, the guideline definition of intended loss changed. It changed from pecuniary harm intended to result from the offense to pecuniary harm that the defendant purposely sought to inflict. That was a really significant change. That definition, neither the old definition or the new definition, were brought up or addressed at sentencing. The intended loss that the court found was the total of the claims, which was five times the actual loss. And what happened here is what the sentencing commission, by the amendment, specifically sought to change. In the case they relied on, the Manitow case, there the court said, you can't just stack up the credit maximums in a credit card fraud case. Here, this doesn't— This isn't the credit card maximums. This is what the claims were that were actually submitted. Yes. My argument is that you can't stack the claims, especially when there is no evidence that the defendant knew what those claims were. These were claims that came from attorney's pleadings and medical clinics, claims that they submitted to insurance companies. But McFadden knows that the doctors and the lawyers are going to submit claims, and he knows that he and his people are only going to get a certain cut. Well, assuming that the government would have to prove by a preponderance of the evidence what percentage of the cut he thought. He just knows he's going to get paid. He doesn't have to know that it's a percentage of something. He knows it's not the whole thing. He knows the other guys are going to be taking their cut, too, right? Right. And what— —intention when it's foreseeable that these other folks are going to be submitting claims. I mean, it's not just like you get a phony credit card that has a maximum, but you only use it once. There I understand the difference. The fact that you got a card that you could have put in more, but you didn't, is a rather different thing than somebody who understands that his co-conspirators are also inflating this amount. They're inflating it beyond what he's going to get, or it wouldn't make sense for them to do it. So why—what is the problem with saying he intends whatever they do? I don't see a problem with saying he intends whatever they get, but I see a problem with saying that he intends whatever their lawyers and clinicians claim, because he can't have purposely sought to inflict the harm, to obtain that money, when he didn't even know how much was being asked for. This is a situation—especially, for example, in— You give somebody a gun to rob a bank, and he goes and robs the bank. You don't know how much money he's going to get in the bank, and you don't know how much money is in the till. Don't you intend that he's going to get as much as he can get? I don't—I think the bank robbery statute has different language. It doesn't say that an element is the amount that he purposely intends to obtain from the bank. Well, it's a loss calculation as part of what goes into the guideline for that, too, isn't it? Yes, yes. That's what we're talking about here is the loss. There has to be proof of what the intent was. And to make it more specific— What if he says, oh, I don't know how much it's going to cost all of these people who are sort of collateral damage in this process? No intent, therefore no loss? I don't think so. It'd be actual loss, because when you have— It would be actual loss. You get kicked over to actual loss when there's no evidence of the specific intent to take a certain amount. We know he intends it to be greater, because we know he intends that the doctors and lawyers are going to be getting money, too. He intends it to be greater than the actual— The amount that he's going to make and his colleagues are going to make.  My argument is that we add up all of the amounts that were paid by the insurance companies. It may have gone anywhere. But why? What is the difference? By the logic of your argument, that shouldn't be added either, because he doesn't know how much that's going to be. So why stop at the amount that the insurance company decides, because their insurance companies, and no offense to the insurance company lawyers who were here before, they're going to cut back whatever the doctor submits, because that's what they do. So why does the fact that the insurer is chintzy? McFadden doesn't know about that either. All he knows is that the doctors and lawyers are going to ask for more money than they are entitled to, because they're entitled to nothing. And it turns out they asked for X dollars. Why is that not his intended loss? I'm just not following it. Well, intended loss, it's either intended loss or actual loss, whichever is higher. So the intent isn't a factor in the actual loss. It's only a factor if you're going to use intended loss. And when we say he doesn't know, he has no idea how much they're going to get, then there's no evidence of what he purposely sought to obtain, and therefore you have to go to actual loss. That's my argument. Thank you. Thank you. Mr. Misorek. May it please the Court, Your Honors. My name is Mark Misorek. I'm an assistant United States attorney in the Eastern District of New York. I was co-counsel to lead counsel on this trial at the district court level. To begin by addressing Defendant Germany's argument about this being a rimless wheeled conspiracy, even if counsel was correct that this was in fact a rimless wheeled conspiracy, the government's position is that there was no substantial prejudice to Defendant Germany in that instance. More specifically, each defendant was convicted of the substantive mail fraud that was related to that defendant after the trial. And more importantly than that, each defendant was acquitted of the aiding and abetting charges in the trial. So there could be no clearer proof that there was no spillover, for lack of a better word, to other co-defendants based on the accidents. Again, if you're viewing the January 22nd accident as one conspiracy, there's no spillover from those other accidents. What about the aiding and abetting acquittals, though? Doesn't that show that there may not have been an interconnection among people other than the two in the center of the wheel? I believe reasonable minds could differ on whether or not someone believes this to be a single conspiracy or to be multiple conspiracies. So if this court were not to adopt the logic that the district court provided, as well as the government's put forward in their brief, it makes no difference because the variance here was minor at best. And again, there was no substantial prejudice to the defendants. I would next point to the fact that no Pinkerton charge was given. So again, there was no potential for reverse Pinkerton effects. And third, again, in the case law, there's references to a shocking spillover. These were rather mundane. I mean, you have accidents where people are bumping into cars saying, okay, hold on, we got it wrong. And they're going and doing it again. I believe counsels here would have a point if during one of the subsequent accidents, for instance, in a hypothetical, if someone lost an arm. Maybe you could see there would be some prejudice of the jury trying to hold everybody responsible for that type of event. But here, and I believe the court had previously asked about multiple do-over accidents. There was one other accident that was referenced in the transcripts where it was, again, a do-over. But that just goes to how inconsequential these accidents were. I don't believe anything rose to the level of shocking spillover that could prejudice, in this instance, Mr. Germany. Moving to defendant Brown's argument, that there was a sufficiency argument, I believe the rule 29. I would point to a number of things I don't believe that are cited in any of the briefs that were contained in the appendix. First, there was Mr. Cook, one of the other, I would suggest, hubs of the conspiracy with Mr. McFadden. There's testimony that he specifically coached Mr. Brown. He met him at the barbershop, and he coached him as to what he was expected to do here. More specifically, and I believe these are the references now to facts that are not in the briefs. After the first accident, Cook and McFadden discussed that they needed to go to a second location. And more importantly, Mr. McFadden immediately gets on a phone. Now, the jury was free to use that circumstantial evidence. The testimony that's contained in the appendix is clear that they're discussing the accident needs to be done again. So there's only one of two cars essentially he could be talking to, the U-Haul or the Red Pacifica. There's again testimony that there's back and forth communications, and that first site was appendix 218 to 220. Then there's testimony that Mr. Cook testified McFadden was back and forth trying to find a second location to do the accident. That's appendix 223 and 225. Again, the jury was free and did choose to credit this testimony. Who's in the car with Brown? With Mr. Brown, it is Thompson, Osborne. Thompson and Osborne. They're in the Red Pacifica. So who's McFadden talking to or Cook talking to? I don't, I'm sorry. What is it that Brown's supposed to have overheard in these conversations, if anything? McFadden and Cook are in one car together, and they're the hub orchestrating this conspiracy. They're on the phone after the first bump where everybody agrees it wasn't enough, saying okay, we need, Cook testifies, he hears McFadden saying, this has to be done over again. That's not enough damage. We have to find a second location before everybody panics and moves away from doing this. There's additional testimony that- No, absolutely not. There was a lot of cross-examined objections at that point, but it was never made clear. Or, and I believe Mr. Cook actually stated, he did not know who Mr. McFadden was speaking to. But isn't, I mean, I guess your argument is it's a logical inference that if they're going to stage a second accident, they have to tell the people who are staging where it's going to be and- No, and that's the government's position. There's a limited number of people that they could have been communicating with. Well, they have to communicate with both of them, don't they? Isn't that the logic of this? Yes, and- To say to the U-Haul driver, go find this guy somewhere in Brooklyn in his red car and hit him again. There has to be a pre-arranged location where that's going to happen. That would be the logical inference. Yes, and I would point out that Appendix 558, Daria Tang, the driver of the U-Haul, testified that the U-Haul was stopped. Mr. Cook approached the U-Haul again after the first accident and had a verbal conversation about repeating the accident. I therefore think it's fair that the jury could have concluded, if they had an in-person meeting, then the jury could have concluded the phone calls were to the Red Pacifica, which Mr. Brown was in that vehicle. So I believe there was a substantial amount of facts placed before the jury that they could have reasonably concluded the second accident was by no means a mistake, but was part of, in this instance, the conspiracy. And then turning to Mr. McFadden, in terms of the speedy trial clock, I would just point out a number of the facts are referenced in the brief in terms of the number of initial defendants indicted. There were two facts, I believe, that I would point to. There is, in the government appendix 35, Mr. Lato actually states on the record that he believes it to be a four week trial. Although he states the government believes it to be three, Mr. Lato believes it to be four. I would just point that out because at points in multiple, I believe it was multiple briefs, the point is made that this was a relatively short trial. I believe in good faith, and again now, Government Appendix 49, there was a significant discussion of the voluminous discovery turned over here. I believe in good faith that all defense counsel, as well as the government attorneys, believe this case was going to last a substantially longer time than it in fact did. And I believe in the context of speedy trial, the number of defendants, the record of the voluminous discovery that had been turned over. I believe all the applications for continuance as other defense counsels, some pleading their clients out, some cooperating their clients, called down the number of defendants. I believe everybody was anticipating at least a three to four week trial with multiple defendants. And as to judicial economy alone. Would you agree that the judge has to make a finding that it's in the interest of justice to exclude the time? I would. That a waiver is not sufficient. Just, if everybody gets up and says, we don't care about a speedy trial, we waive. The judge can't just say, okay, the judge has to make a finding, which the judge did here. He used rather strong language about the interest of justice. But that finding is necessary, right? Absolutely, Your Honor. So I'm puzzled. I've been puzzled forever why the Eastern District submits, asks people to sign something that's called a waiver when a waiver has no effect. It seems to me that's the kind of thing that could lead a new judge especially into error. This isn't a new judge, he's a very experienced judge. But to have a form that says waiver and submit those to judges when the law is clear that a waiver won't do. That the judge has to make a finding. It would seem to me the assistant should be up telling the judge, don't just take their waivers now, you have to make a finding. Here's the language you have to use. Here's what you have to conclude, right? It's just a puzzle to me. I believe it's a fair point. I mean, I don't think it hurts that if a record is made to defend further signs. In this case, if a record is made, it doesn't hurt that there's also something called a waiver. I'm just puzzled as to why anybody thinks it does any good to have something called a waiver. And I'm submitting to you that maybe you're off to sort of think about whether, especially with the likelihood that new judges are going to be appointed sometime in the near future as vacancies open up. That maybe you don't want to be telling judges something that implies that people have waived and that's a great thing. Because it seems to me it's clear it's not under the law. I appreciate it. Unless the court has additional questions, the government would rely on its brief. Thank you. All right. Thank you. Mr. Laito, you've reserved one minute. Thank you, your honor. Mr. Messorek talks about a rimless wheel conspiracy. There's no such thing. There's a rimless wheel of several conspiracies and that's what we have here. With respect to prejudice, the jury perhaps subconsciously getting to the sufficiency of the evidence may well have considered that Germany had to have known what was going on given the bombardment of the other five conspiracies and the 27 additional co-conspiracies. In Katiekos, this court as the intermediate appellate court found the evidence so convincing that there was really no chance that an innocent person could be convicted. But what the Supreme Court did in reversing this court and said, with all deference to this court, we agree that the error did not affect substantial rights, and that was the right not to be tried en masse in this type of conglomeration. Thank you. Thank you, your honor. As we stated, we agree with Mr. Laito's argument with respect to count one and add that we believe there's sufficiency and that the variance here was very prejudicial. The government, both in opening throughout the trial and in their summation, emphasized to the jury that they should consider strongly the testimony of the other defendants, the other defendants, and it emphasized that in their summation. So that is important as well as when you consider the judge's instruction that said to the jury that they can consider in their determination the testimony of these witnesses. So while a direct Pinkerton charge wasn't given, an explicit one, implicitly there was, particularly when you add the indictment and the charges that included references to other insurance companies having nothing to do with the evidence that was presented as to Mr. Brown. So we would say that the variance here as to count one was particularly prejudicial. And it need not be shocking that they were different, but in fact it's shocking because the amount that was introduced as compared to that which was introduced as to Brown, makes it so very prejudicial. With respect to count two, we would say that the government overstates its case when it says everybody agreed with respect to the conversations back and forth. What we have here is that there is no testimony of direct communication with the car in which Mr. Brown was a passenger, and importantly- What could possibly happen without coordination? I'm just, why couldn't a jury reasonably infer that they must have spoken to both the car and the truck? Because otherwise, how do they both wind up at the same place at the same time to have the second accident? Because in fact, what the problem here is, with all due respect is to the record shows that Mr. Cook testifies that there was no plan, that there was all confusion. And as opposed to the first, there was no plan, and he, Mr. Cook, didn't know that the accident was about to happen, so that this coordination didn't exist. And there's no evidence that there's coordination between car one, the U-Haul, and the Red Pacifica. Remembering- Why isn't that a jury question that they can sort out? Because in fact- Since Mr. Cook put his credibility on the line in testifying the way he did. Because what's missing here is evidence of that, so it's speculation. You cannot infer from the lack of evidence that there is evidence. What we have is direct testimony that there was conversation between the U-Haul. And when he's asked, when Cook is asked, well, what about, who were they talking to? He says, I don't know. So, and when it's 20 minutes, I think the 20 minutes is important because they're on their way back. It's not right away. So, who's planning this? Not Cook. The U-Haul is just hunting all over Brooklyn and just happens, look, there's the car we're supposed to hit. The testimony was that in fact they're going back home. Who knows, maybe the driver of the Red Pacifica didn't know his way back home. And they were in tandem because of that. But there's no testimony as to why they're there, only that they're going back to Brooklyn. And importantly, even if the driver of the Red Pacifica agreed, there's nothing in that record that indicates beyond speculation that Mr. Brown, other than being in a vehicle of which he's a passenger, agreed to be part of another staged accident and agreed not to be injured because that was the agreement. And I think that's really the rub, that they had all this other evidence, the jury, which really had to influence them, which the court said you can consider. So, I see over my time, I apologize. Thank you very much. Thank you, Ms. Newman. Ms. Wolfe. I think it was Judge Lynch that asked whether someone should have said something to Judge Hurley, like plea negotiations aren't a sufficient basis for an exclusion. I want to point out that the time period I'm focusing on is the date on which Mr. McFadden said openly, I will not waive my speedy trial rights. And that was from September 2013 until February 2014 when a new defendant was indicted. So he did say something. He said, in response to the question, do you waive your speedy trial rights? He said no. You can't waive the speedy trial rights. The issue is, what you're telling me is one of two things, it seems to me. Either the judge made a clearly erroneous fact finding in saying that there needs to be additional time for plea negotiations, or that he somehow abused his discretion in deciding how long an exclusion was appropriate. Is that not the gist of the argument? Because he did make a finding. I mean, he does make a finding on the record that it's in the interest of justice to exclude this time. He says it in so many words. And the reasons that he gives are not sufficient under the case law to support an exclusion. So that's the crux of the argument. And I want to just point out one other thing, which is that before this time period, September 2013 to February 2014, the prosecutor on July 10, 2013 put on the record that he had produced all of the discovery some time ago, and that's on the government's appendix 14. So by the time Mr. McFadden says enough, I want a speedy trial, the government says they have produced all of the discovery some time ago. Thank you. But you're not saying that discovery, or the need to review discovery is the only reason that Judge Hurley could have found was a basis for the extension. No, not at all. In fact, I was surprised that that didn't come up more prominently. Prosecutor would just report on the status of discovery, and it wasn't made part of the judge's reasons. It was this very narrow plea negotiations. Thank you. Thank you, all four of you, or five, Ms. Berger. We'll reserve decision in this case.